## McReynolds v. McCallie et als.

Construction of an Act. *Illegitimate child legitimated.* Under act of 1805, the change of name of an illegitimate child, on application of the putative father, is to be done only on party proposing to make the child his heir or joint heir, which must be entered as the opinion or decree of the court. Therefore, where it is shown the name of the child was so changed, and the record has been destroyed, it would follow that the child was made an heir, and entitled to inherit the estate of the father.

### FROM MONROE.

Appeal from the Chancery Court at Madisonville. W. M. Bradford, Ch.

McCloskey & Robertson for complainant.

Prichard for defendants.

Freeman, J., delivered the opinion of the court.

The question in this case is, whether complainant was legitimated by the County Court of Monroe county in 1854. His right to the property of his puta-

tive father, J. C. McReynolds, or Hugh McReynolds as he is called, depends on this fact. The records of the County Court have been destroyed so that the facts have to be shown by secondary evidence.

The complainant is the illegitimate child of the deceased Jehu C. McReynolds. He claims he was legitimated by the County Court in 1854, on petition of his father. This is denied by respondents, who are the heirs at law of deceased, in the event complainant does not make out his claim. They insist that his name was only changed from Hicks, the name of his mother, to R. E. McReynolds, being named for his grandfather, in whose house he was kept up to his death and who, it seems, was attached to him.

The question will have to be solved very largely by the provisions of the statutes in force at the time, in connection with the parol proof in the record of what was done, and of record, in the County Court of Monroe.

The proceeding took place in 1854 before the Code was enacted. The statutes then in force were as follows:

By the act of 1805, ch. 2, sec. 1,—"Any of the Circuit or County Courts of this State shall have full power and authority to alter the name of any illegitimate person, on application of any person wishing to make legitimate any of their offspring not born in wedlock; *provided,* said applicant intends to make said illegitimate person heir or joint heir to his or her estate. By sec. 2,—" Each applicant shall prefer a petition to the court, setting forth his or her reasons

for legitimating said person, and, if the court shall think the reasons sufficient as stated in the petition, they shall direct the petition to be recorded at length, together with the opinion of the court, that said person made legitimate as aforesaid has become heir or joint heir of the person petitioning."

The act of 1827, ch. 16, gives the Circuit Court jurisdiction on application of any person residing within the jurisdiction, to change or alter the name of such person. This has no application to the question.

By the act of 1852, pamp. acts, p. 618, it is provided, sec. 1: "That the County Courts of this State shall have concurrent jurisdiction with the Circuit Court to change and alter the name of any person, and the clerk to have the same fee allowed by law in such cases to the clerk of the Circuit Court, that is, one dollar as provided by act of 1827." This section only authorizes the County Court to do what the Circuit Court could do by the act of 1827, that is, alter the name of any person petitioning for it, and setting forth reasons, good and sufficient in the estimation of the court. It is done however on the application of the person himself, as is evident not only from the language of the first section, but also by the next section, providing such person shall be known and designated by his new name, and sue and be sued, plead and be impleaded, by the new name thus conferred, or by his former name, evidently indicating the fact, taken in connection with the first section, that the party is supposed to be *sui juris*, and capable of suing and being sued. Sec. 2 of the act

of 1852, provides: "That the County and ·Circuit Courts have concurrent jurisdiction and power to au- ·thorize and empower any person or persons to adopt any child or children as their own upon application by petition or motion, and the adoption, and the names of the parties, and the terms of the adoption, shall be entered upon the records of the court, and the court shall have discretion to refuse the prayer of the petition. Such act shall confer upon such child or children the rights of a child or children, as if they were born the child or children of such parent, and capable of inheriting or succeeding to the personal or real estate of the parent as heir or next of kin, but shall confer no rights upon the person making the adoption to inherit or succeed to the personal or real estate of the child adopted, nor give him any right or interest in the estate of such child.

It is proven clearly that the County Court did make a decree in 1854, on the petition of the deceased Jehu C. McReynolds, and that from and after this time he, the complainant, was known by the name he now bears. Complainant introduces the then clerk of the County Court, who proves, about as definitely as any conscientious man would swear to such a matter after the lapse of time that had occurred, that the complainant was then legitimated. This is his impression and best memory as to what was done. One of the justices who composed the quorum court at the time corroborates this view, as well as the sheriff or deputy sheriff at the time, who was in attendance on the court. The other two magistrates composing the court

are dead. This would seem to give the preponderance in favor of complainant's contention, or at any rate make out a strong *prima facie* case.

In reply to this, however, it is shown that Judge George Brown was the counsel who attended to the matter in court for Dr. Hugh Reynolds, as he calls him, having been known always he says by that name. He resided at Madisonville at the time. He says that when asked about what was done, his impression was that the proceeding in the County Court had legitimated and adopted complainant as his heir, but that on looking at the entry made on his books, in which he had charged for the service, he was satisfied from the entry then made that he was wrong, and his opinion is, from said entry, that he was not legitimated, but only his name changed.

The following is the entry spoken of:

"1854, November. Hugh McReynolds of Ga., Dr. to George Brown, to filing a petition in the County Court, and getting the name of Robert Hicks changed to Robert McReynolds—an illegitimate child—$5.00."

It is because this entry, and solely for this cause, only states the fact that the petition was filed and the name procured to be changed, and so stated in the entry, that Judge Brown concludes his first impression was a mistake, and that what was done was only to have the name changed from Hicks to McReynolds. He says he drew the papers, he has no doubt, with the statutes before him.

Now, if he had drawn the petition under sec. 2, of the act of 1852, it would have been for the adop-

tion of the child, and he, from his explanation of his habit in making such entries, would have so stated; such adoption too would have made the child the heir of the party adopting him. It could not have been drawn under the first section, because that is to be done under the act of 1827, the section of the act of 1852 only giving the County Court the same jurisdiction as the Circuit Court had by the act of 1827. By this act, as we have seen, the name of a party could be altered on his own petition. This is not in accord with the fact that the complainant was then not quite eight years old, having been born December 5, 1846. What was done was evidently on the petition of the father, J. C. McReynolds, and so the proof of the clerk and other parties shows. It is very clear then that what was done was on his petition, and must have been an application under the act of 1805. By that act, as we have seen, the County Court had power to alter the name of any illegitimate child on application of a person wishing to make legitimate any of their offspring not born in wedlock; *provided,* said applicant intends to make said illegitimate person his heir or joint heir. Now, the court could only alter the name where this was the purpose, and by the second section, that when said act was done by the court, the petition should be recorded, together with the opinion of the court, that said person, made legitimate as aforesaid, has become the heir or joint heir of the person petitioning. It is clear the application to alter the name in the first section is treated by the statute as the equivalent of legitima-

tion, and the court is to decree the fact on granting the petition. We can well see how Judge Brown might have made his entry as for altering the name of an illegitimate child, and yet that it would certainly follow, if this was done, that the party was made by the act the heir of the party filing the petion, and thus his entry, corresponding with the facts of the transaction, be true, and still the conclusion be incorrect, that the party was not legitimated. His memory was correct, we have no doubt, when he says his first impression was that he had been legitimated. He only drew an incorrect inference from the entry, that not only did not contradict his impression, when taken in connection with the law under which the court acted, but really corroborated and sustained it. The petition was to alter the name, the effect of which was to make the party heir of the petitioner. It could only be done by that court, with such a purpose, and the decree was to be so entered on the minutes of the court. That this was done we cannot doubt. Here was an application by the father to alter the name of his son, that son was his illegitimate child, when so altered the court decreed or entered its opinion on the minutes, that the party was his heir or joint heir. The father was unmarried, had no other child, and so died. It was natural that he should thus legitimate his only child. His after conduct shows that he intended to provide for him as his child. He took him to Georgia after the death of his grandfather, educated him, and ultimately taught him his profession—dentistry, formed a

partnership with him which continued until the son left and went west, perhaps to push his own fortune, ultimately settling in the city of Louisville.

In view of these facts we are compelled ·to conclude complainant's right is established, and to reverse the decree of the Chancellor, and direct a decree in accordance with this opinion. Costs to be paid out of the estate, the property being in the hands of a receiver, who will be directed by the court below to pay the sum out of any monies in his hands.